423 So.2d 1377 (1982)
Raymond MILLER
v.
STATE.
3 Div. 490.
Court of Criminal Appeals of Alabama.
July 27, 1982.
Rehearing Denied August 24, 1982.
Certiorari Denied November 19, 1982.
On Return to Remand December 28, 1982.
*1378 Richard A. Lawrence, Montgomery, for appellant.
Charles A. Graddick, Atty. Gen., and Jeanne Weston, Asst. Atty. Gen., for appellee.
Alabama Supreme Court 81-1025.
DeCARLO, Judge.
Burglary, third degree; thirteen months.
After waiving a jury trial, the appellant was tried by a judge and found guilty of third degree burglary. Prior to trial an evidentiary hearing was conducted on appellant's motion to suppress. The motion was denied and the testimony taken at the hearing was adopted in the non-jury trial on the stipulation of the parties.
At the suppression hearing, Montgomery Police Officer Michael Patterson testified that early on the morning of July 4, 1981, he and his partner were patrolling an area in Montgomery, Alabama, described by Patterson as a "high crime area." At approximately 1:10 A.M. they saw a vehicle with a large air conditioner protruding from its open trunk proceeding ahead of them. The officers turned on their blue light and stopped the vehicle, which was occupied by the appellant, his sister, and one Curtis Lewis.
Patterson asked the three to step out of the vehicle and explained to Curtis Lewis, the driver of the vehicle, that he had stopped the car in order to inquire about the air conditioner protruding from the trunk. The appellant, Raymond Miller, at that time voluntarily stated that he got the air conditioner from his aunt and gave the officers his aunt's telephone number so they could confirm this.
According to Patterson, he radioed the "Desk" and requested that the aunt be called. Subsequently, he received from the "Desk" the information that the only person answering at that number was a child who did not know anything about the air conditioner. Patterson relayed this information to the appellant and the appellant then volunteered to take the officers to his aunt's residence. Appellant and his companions re-entered their vehicle and Officer *1379 Patterson and his partner followed the trio some four or five blocks to a residence at 2569 Lark Drive.
On their arrival, Patterson went to the house and knocked on the door while the appellant and his companions remained in their car. The only person at the house was a child. Patterson questioned the child about an air conditioner and the child stated that their air conditioner was kept in a storage area at the rear of the house. At Patterson's request, the child showed him the storage area and Patterson observed an air conditioner in the storage area.
As Patterson was returning to the patrol car, he noticed that a window in the house next door was "standing open." No lights were on in the house. Patterson inspected the area around the window and observed where air conditioner mounts had been. He also found, on the ground below, "cardboard fillers" that had been used between an air conditioner and the window. He then returned to the vehicle occupied by the appellant and his companions and informed them that they would be detained until a detective unit arrived. Patterson testified that their car was in a lighted area and that he observed cardboard filler attached to the air conditioner in the open trunk. This cardboard filler matched the filler found on the ground under the open window of the house next door to the house appellant identified as his aunt's house.
The appellant testified at the hearing that he told the officers that he had obtained the air conditioner from his aunt. He admitted, however, that he later told the officers that he had purchased the air conditioner from "[a] black dude with a big truck with big tires on the back of it." The appellant also testified that he took the officers to his aunt's house at their request, rather than volunteering to do so. However, he admitted that the house to which he led the officers was not his aunt's house, but instead was occupied by his girl friend, Antoinetta Johnson.
At the non-jury trial, the air conditioner was shown to be the property of the estate of Belinda Huett and to have a value of approximately $500.
Janet Miller, the sister of the appellant, was called as the court's witness. She testified that the car stopped by Patterson and his partner belonged to her and was being driven by Lewis with her consent. She further testified that she had been with Curtis Lewis, Antoinetta Johnson, and the appellant on the evening of July 3, 1981, and that the four had gone to Johnson's house at 2569 Lark Drive. Ms. Miller acknowledged that she had given a statement to the police in which she had stated that the air conditioner had been placed in the trunk while the four people were at Johnson's house.

I
Appellant maintains that he was subjected to unreasonable seizure contrary to the Fourth Amendment of the United States Constitution when the vehicle in which he was a passenger was stopped by the Montgomery Police. He argues that the officers did not have a "reasonable suspicion" to justify the stopping or seizure of the vehicle and that the incriminating evidence developed as a result of this seizure was inadmissible.
Stopping an automobile and detaining its occupants is clearly a seizure within the meaning of the Fourth Amendment. Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); Johnson v. State, 406 So.2d 446 (Ala.Cr.App.1981). It is well established, however, that all seizures are not contrary to the Fourth Amendmentonly unreasonable seizures are prohibited. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).
Prior to Terry v. Ohio, supra, a warrantless seizure was reasonable under the Fourth Amendment only if it was based upon probable cause. Dunaway v. New York, 442 U.S. 200,99 S.Ct. 2248, 60 L.Ed.2d *1380 824 (1979). In Terry, the United States Supreme Court formulated the concept of the "investigatory stop" based on "reasonable suspicion." In certain circumstances, a police officer may stop a person for "purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Terry v. Ohio, 392 at 22, 88 S.Ct. at 1880. While the officer making the stop is not required to possess a level of knowledge amounting to probable cause, Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), he "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts reasonably warrant investigating." Terry v. Ohio, 392 U.S. at 21, 88 S.Ct. at 1880.
Although Terry was factually concerned with stops of pedestrians, the concept of the investigatory stop has been extended to stops of vehicles. Delaware v. Prouse, supra; United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); Minnifield v. State, 390 So.2d 1146 (Ala.Cr.App.), cert. denied, 390 So.2d 1154 (Ala.1980). Therefore, we must ascertain whether "the facts available to the officer at the moment of the seizure or search `warrant a man of reasonable caution in the belief that the action taken was appropriate.' " Terry v. Ohio, 392 U.S. at 21-22, 88 S.Ct. 1880.
The record shows that Officer Patterson was aware of the following facts when he stopped the vehicle in which appellant was riding: (1) the area was known as a high crime area, (2) the time was 1:10 A.M., (3) the trunk of the vehicle was fully open, (4) a large air conditioner was protruding from the trunk. The appellant contends that these facts are not sufficient to produce a reasonable suspicion for an investigatory stop of the vehicle in which he was a passenger.
The United States Supreme Court stated in United States v. Brignoni-Ponce, supra, that an officer "may consider the characteristics of the area in which they encounter a vehicle" in determining whether reasonable suspicion exists. 422 U.S. at 884,95 S.Ct. at 2582. Although Brignoni involved a border area stop, we think the statement is applicable in this case. Moreover, an officer may in all situations assess the facts in light of his experience. Terry v. Ohio, 392 U.S. at 27, 88 S.Ct. at 1883. Officer Patterson testified at the suppression hearing that he had been patrolling this area some ten weeks, that "[w]e have a lot of burglaries out there," and that only three days prior to the incident involved in this case he had "walked up on" a robbery in that area. He stated that "it did seem unusual to me that someone would be moving an air conditioner that size and that bulk in that area at that time of the morning."
Officer Patterson did not stop the vehicle in which appellant was riding at random, but instead, pointed to "specific and articulable facts" on which he based his investigatory stop. Under the circumstances, we cannot say that it was unreasonable for Officer Patterson to stop this vehicle in order to inquire about the air conditioner in the open trunk. The fact that the trunk was fully open and the lid therefore obstructing the driver's rear view vision alone may have provided a legitimate reason for a stop of the vehicle. See Delaware v. Prouse, 440 U.S. at 663, 99 S.Ct. at 1401.

II
The appellant asserts that if the initial stop of the vehicle in which he was riding was based on reasonable suspicion, the stop became unreasonable thereafter because it exceeded the brevity requirement of an investigatory stop.
The concept of the investigatory stop has been condonned because of its limited or brief intrusion upon the constitutional rights of citizens. Dunaway v. New York, 442 U.S. 210-12, 99 S.Ct. 2255-56 (and cases cited therein). However, the Supreme Court has recognized that the well established *1381 consent exception to warrantless searches and seizures may operate to extend the stop and investigation:
"[An officer] may stop the car briefly and investigate the circumstances that provoke suspicion. As in Terry, the stop and inquiry must be `reasonably related in scope to the justification for their initiation.' The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention must be based on consent or probable cause." United States v. Brignoni-Ponce, 422 U.S. at 881-82, 95 S.Ct. at 2580. [Emphasis added and citations omitted].
In the instant case, the officer stopped a car and questioned the driver about a large air conditioner protruding from the open trunk. This was a permissible question under Brignoni. In response to the question put to the driver, the appellant stated that he had obtained the air conditioner from his aunt. Not only did the appellant volunteer this information, he gave the officer his aunt's telephone number and suggested that the officer telephone his aunt and verify his story. When the officer informed him that his story could not be verified by telephone, the appellant offered to show the officer the house where he had obtained the air conditioner. These actions on the part of the appellant amounted to his consent to further detention and investigation.
To be effective, consent to a warrantless search or seizure must be voluntarily given as determined from the "totality of all circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973). Without belaboring a point not raised below, we think it worth noting that there was no "search" in the Fourth Amendment sense involved here. Appellant's person was not searched and the air conditioner was in "plain view," see Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), obviating the need to search the trunk of the car. We are concerned only with appellant's consent to the continued seizure of his person.
It is abundantly clear from the record that the information regarding the appellant's aunt and the suggestion to telephone her were voluntarily given:
"THE COURT: Did you tell them after they stopped you and you said something about, well, you can call my aunt, here is the phone number and she'll know about it? Did you tell them that?
"THE DEFENDANT: Yes, sir.
"THE COURT: Why did you tell them that? What would she have known about the air conditioner you had in the trunk?
"THE DEFENDANT: Well, my aunt did see an air conditioner in the trunk of my car, my sister's car.
....
"MR. HAWTHORNE: [District Attorney] But you did volunteer and tell the police that you
"THE DEFENDANT: No. They said, take us to the house.
"MR. HAWTHORNE: I'm not talking about taking it. You said your aunt gave you that air conditioner.
"THE DEFENDANT: Yeah, I came right out and said that."
According to Officer Patterson, the appellant similarly volunteered to take them to his aunt's house. The appellant maintains that he did so at the officer's request. If the officers did make this request of the appellant, it is analogous to a request to make a search of a suspect's person or house and does not, without more, negate the voluntary nature of appellant's actions. The surrounding circumstances must be considered. There were only two officers involved and neither displayed a weapon. It does not appear from the evidence that the officers used language or a tone of voice indicating that compliance with their request might be compelled or that they physically touched the person of the appellant. See United States v. Mendenhall, *1382 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Indeed, the appellant and his companions were not even placed in the police car, but were allowed to lead the officers to the appellant's aunt's residence in their own car. In view of these circumstances, we find that the appellant acted voluntarily in remaining with the officers.

III
The appellant complains that the State failed to prove a prima facie case of burglary in the third degree.
Our examination of the record and transcript of evidence shows that the appellant failed to make a motion to exclude the State's evidence, that he failed to request the affirmative charge and that his motion for a new trial did not raise the sufficiency question. It is well established that one of these procedures must be followed in order to properly preserve the issue for appellate review. Lewis v. State, 372 So.2d 882 (Ala. Cr.App.), cert. denied, 372 So.2d 885 (Ala. 1979).

IV
The record and transcript of evidence shows that the district attorney filed a timely motion to have the court consider this appellant as an habitual felony offender under § 13A-5-9, Code of Alabama 1975. It was shown that appellant had been convicted on a plea of guilty on September 25, 1981, for the felony offense of receiving stolen property in the second degree. Following this conviction he was found guilty in the instant case of burglary in the third degree and was given a sentence of thirteen months to run concurrent with the sentence in the previous conviction. This sentence was suspended on the condition that the appellant serve four months in jail.
Burglary in the third degree is a Class C felony. § 13A-7-7, Code of Alabama 1975. Where it is shown that a criminal defendant has been convicted of one prior felony offense, the sentence that must be imposed for a Class C felony is "not more than 20 years or less than 2 years." §§ 13A-5-6, 13A-5-9, Code of Alabama 1975; Watson v. State, 392 So.2d 1274 (Ala.Cr.App.), cert. denied, 392 So.2d 1280 (Ala.1981).
We remand this cause to the trial court with directions to conduct another sentencing hearing applying the Habitual Felony Offender Act.
REMANDED WITH DIRECTIONS.
All the Judges concur.

ON RETURN TO REMAND
DeCARLO, Judge.
On return to remand, the record shows that appellant was sentenced to two years imprisonment pursuant to the Habitual Felony Offender Act, § 13A-5-9, Code of Alabama 1975, in compliance with our opinion issued July 27, 1982.
The judgment of conviction by the Montgomery Circuit Court is hereby affirmed.
AFFIRMED